FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 21, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAXON H.,[1]

                Plaintiff,

    v.

MARTIN O'MALLEY, Commissioner of
Social Security,

                Defendant.

No.    1:23-cv-03189-EFS

**ORDER REVERSING THE ALJ'S
DENIAL OF BENEFITS, AND
REMANDING FOR FURTHER
PROCEEDINGS**

Due to a rare immune disorder, tumor necrosis factor receptor-associated periodic fever syndrome (TRAPS), Plaintiff Jaxon H. claims that he was unable to work fulltime from July 1, 2019, through April 12, 2021, and applied for supplemental security income benefits for a closed period of disability. He appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly assessed Plaintiff's credibility, the ALJ erred when assessing

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

DISPOSITIVE ORDER - 1

whether Plaintiff met or equaled a listing, and the ALJ improperly analyzed the opinions of the evaluating medical sources. As is explained below, the ALJ erred. This matter is remanded for further proceedings.

## I.    Background

In July 2019, Plaintiff filed an application for benefits under Title 16, claiming disability, based on the physical impairments noted above.[2] The agency denied Plaintiff's claim at the initial and reconsideration levels.[3]

After the agency denied Plaintiff benefits, ALJ Sue Liese held a telephone hearing in February 2023 at which Plaintiff appeared with his representative.[4] Plaintiff and a vocational expert testified.[5] Plaintiff's attorney amended the claim to one for a closed period of disability, and Plaintiff testified that the main reason that he could not work during the period from July 2019 through April 2021 was that he suffered from TRAPS and was able to work when not ill but would have flare-ups or breakthrough symptoms every three weeks and did not think an employer would tolerate so many absences.[6]

---

[2] AR 169, 214.

[3] AR 84, 94.

[4] AR 32-55.

[5] *Id.*

[6] AR 42.

After the hearing, the ALJ issued a decision denying benefits.[7] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[8] As to medical opinions: the ALJ found:

- The opinions of state agency evaluators Michael Regets, Ph.D., and Vincent Gillogly, Ph.D., to be persuasive.

- The opinions of state agency physician Alnoor Virji, MD, to be somewhat persuasive.

- The opinions of state agency physician Charles Lee, MD, to be not persuasive.

- The opinions of examining physician William Drenguis, MD, to be not persuasive.

- The opinions of examining source Troy Bruner, Ed.D., to be persuasive.

- The opinions of examining psychologist Trevor Davis, Psy.D., to be not persuasive.

- The opinions of DSHS consultative examiner Marquetta Washington, ARNP, to be not persuasive.[9]

---

[7] AR 14-31.  Per 20 C.F.R. §§ 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[8] AR 23-24.

[9] AR 23-24.

The ALJ also considered the third-party Function Report completed by Plaintiff's mother, Julie Lancaster.[10] As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity between July 1, 2019 and April 12, 2021; but did engage in substantial gainful activity from April 12, 2021, through the date of the hearing.

- Step two: Plaintiff had the following medically determinable severe impairment: tumor necrosis factor receptor-associated periodic syndrome (TRAPS).  The ALJ also found that depressive disorder was non-severe.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC:  Plaintiff had the RFC to perform a full range of work at the light exertional level with the following exceptions:

    He can lift and carry ten pounds frequently and 20 pounds occasionally; can stand and/or walk for at least six hours during an eight-hour workday; can sit for at least six hours during an eight-hour workday; could do occasional climbing of ladders, ropes, and scaffolds; and could occasionally crawl.

- Step four: Plaintiff has no past relevant work.

---

[10] AR 24-25.

DISPOSITIVE ORDER – 4

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a cashier (DOT 211.462-010), storage facility rental clerk (DOT 295.367-026), and router (DOT 222.587-038).[11]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[12]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[13] and such error impacted the nondisability determination.[14] Substantial evidence is "more than a mere scintilla but less than a

---

[11] AR 19-26.

[12] AR 166.

[13] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[14] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[15]

### III.    Analysis

Plaintiff seeks relief from the denial of disability on three grounds. He argues the ALJ erred at step three, when evaluating Plaintiff's subjective complaints, and when evaluating the medical opinions.  The Commissioner argues there was no error because the ALJ properly evaluated Plaintiff's subjective complaints and considered that Plaintiff's condition improved after the dosage of his medication was changed in 2018 and Plaintiff's daily activities were not consistent with his allegations; that the ALJ properly found that he did not meet a listing; and the ALJ properly evaluated the opinion evidence.  The Court disagrees with the Commissioner. As is explained below, the ALJ's analysis contains consequential error.

---

[15] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

**A.      Symptom Reports: Plaintiff establishes consequential error.**

Plaintiff argues the ALJ failed to provide valid reasons for discounting his symptom reports and failed to account for the time that he would be absent from work for several days a month during flare-ups of his illness. The ALJ offered several reasons for discounting Plaintiff's symptom reports—each reason is addressed below.

1.      Standard

The ALJ must identify what symptom claims are being discounted and clearly and convincingly explain the rationale for discounting the symptoms with supporting citation to evidence.[16] This requires the ALJ to "show his [or her] work"

---

[16] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022). Factors to be considered by the ALJ when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; 6) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

and provide a "rationale . . . clear enough that it has the power to convince" the reviewing court.[17]

When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[18] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection."[19] General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims.[20] "The clear and convincing standard is the most demanding required

---

Soc. Sec. Rlg. 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 416.929(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

[17] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) (alteration added).

[18] *Molina*, 674 F.3d at 1112.

[19] *Ghanim* 763 F.3d at 1163 (quoting *Lingenfelter*, 504 F.3d at 1036).

[20] *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he discounted claimant's symptom claims)).

in Social Security cases."[21] Therefore, if an ALJ does not articulate specific, clear, and convincing reasons to reject a claimant's symptoms, the corresponding limitations must be included in the RFC.[22]

    2.   <u>Relevant Testimony</u>

        a.   <u>*Hearing Testimony*</u>

On February 28, 2023, Plaintiff appeared with his attorney for a hearing conducted by telephone before ALJ Sue Liese.[23]  Plaintiff testified, and a vocational expert, Steven Floyd, testified.[24] Plaintiff's attorney moved that the claim be modified to a claim for a closed period of disability from July 1, 2019, through April 12, 2021, when he was able to return to full-time work.[25] Plaintiff's attorney argued that Plaintiff's dosage of Ilaris was 300 milligrams every four weeks but was increased in 2019 to 400 milligrams every 4 weeks and was again increased in late

---

[21] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

[22] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC.").

[23] AR 32-55

[24] *Id.*

[25] AR 38-39.

1    2020 to 400 milligrams every 3 weeks.[26]  He argued that in April 2021, once on the

2    proper dosage of Ilaris to control his symptoms, Plaintiff returned to full-time

3    employment.[27]

4         Plaintiff testified that he lives in an apartment with a roommate and has no

5    pets.[28] He said that he went as far as the eleventh grade in school but did not

6    complete it and went back to get his GED. [29]  He completed one semester at college

7    for an engineering degree but dropped out in the second semester.[30] He testified

8    that he was employed by Food Service Viking as a sanitation lead and cleaned at

9    night and did chemical testing and paperwork.[31] He had previously worked at

10   Christian Life Center as a part-time janitor, and had worked for UPS as a delivery

11   assistant, who would ride on the truck and hand the packages to the recipient.[32] He

12   said that the job was seasonal and that he did not complete the season because his

13   appendix ruptured.[33]

14

15   [26] AR 39.

16   [27] *Id.*

17   [28] AR 42.

18   [29] AR 40-41.

19   [30] AR 41.

20   [31] *Id.*

21   [32] AR 41-42.

22   [33] AR 42.

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Plaintiff testified that he could not have worked full-time from July 2019 through April 2021 because he would be healthy for three to four weeks and then have bad pain for a week which would make him unable to work.[34] He said it is hard to justify being out of work for a week every three weeks.[35] Plaintiff stated that he went to college in the fall 2019 but was not able to complete the last three to four weeks of the semester because he became very ill and that he passed his classes only because he had high enough grades to finish even with the missed time.[36] He said that the next semester, spring 2020, he had health issues that made him miss the first two weeks and he was too far behind to start so he dropped out.[37] He said that the health issues he had were due to a flare-up of his TRAPS syndrome and that he had fevers, mouth and throat ulcerations, inflammation of the lining of his stomach, swollen tonsils and lymph nodes, swollen joints, and headaches during flare-ups.[38]

Plaintiff said that there were two reasons that he was having flare-ups: that he was not getting his medication on time and that he was under stress.[39] When

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] AR 43.

[38] *Id.*

[39] AR 43.

1  asked if his symptoms were controlled when he was on 400 milligrams of Ilaris

2  every three weeks, he said that there are rare breakthrough symptoms at that

3  dosage but that he was managing it.[40] He said that he was at the highest dosage

4  that could be taken of the medication and that it was not perfect but it worked

5  better than any other medication he had been given.[41]

6       Plaintiff said that when he had a flare-up he did not go to the emergency

7  room but would call his doctor if it was very severe.[42] He said that his doctor had

8  worked out a routine for him to follow of alternating over-the-counter medications

9  every three hours.[43] He said that he was initially diagnosed with PFAPA (periodic

10 fever, aphthous stomatitis, pharyngitis, adenitis), which is a similar but milder

11 disease but did not have all the symptoms.[44] When his symptoms worsened when

12 he was going into high school, his diagnosis was changed to TRAPS.[45]

13      He said that as one ages the condition gets worse and that it started getting

14 worse when he started junior high and he started missing more days of school than

15

16

17 [40] AR 44.

18 [41] *Id.*

19 [42] AR 44-45.

20 [43] AR 45.

21 [44] *Id.*

22 [45] *Id.*

23

DISPOSITIVE ORDER - 12

his classmates.[46] He said that in his second year it was severe and he was sent to a specialist.[47] He said that once he was in high school it was very severe and that he ended up missing almost half the year.[48] His residual symptoms are swelling in his joints and mouth ulcers but they are mild.[49] A couple of years prior his symptoms were more severe and frequent and it took longer to recover from them.[50] He was depressed during that time because he felt stuck but he did not focus on his depression because his focus was on physical pain.[51] Working at a full-time job is helpful in terms of his mental health.[52]  Plaintiff testified that if he gets a regular illness like a cold it can set off his inflammatory cycle and cause symptoms.[53] He said that he is exposed to more illnesses when working than when he stayed home.[54]

---

[46] AR 46.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] AR 46-47.

[51] AR 47.

[52] *Id.*

[53] AR 48.

[54] *Id.*

1    Plaintiff testified that in his present job he works at an apple slicing facility

2 and that he oversees other cleaning staff and at times cleans himself, but has no

3 ability to hire or fire anyone.[55] He said that because they are dealing with food they

4 clean surfaces and then he has to go back later to see if the level of particulates left

5 on the surface is acceptable.[56] He will keep a paper log of the data.[57] He said that

6 he is on his feet for 65% of the shift and that he will lift 30 to 40 pounds.[58] He said

7 that his title is sanitation lead.[59]

8    The vocational expert (VE) testified that Plaintiff's current job was between

9 a lead and supervisor according to the responsibilities he described but that he

10 would classify it as a packing house supervisor (DOT 920.137-010), which is a light

11 job with an SVP of 6.[60]

12    The ALJ gave a hypothetical of an individual of 18 to 20 years, with a GED

13 and no past relevant work who is limited to lifting and carrying 10 pounds

14 frequently and 20 pounds occasionally; could sit, stand or walk six hours in an

15

16 _____

17 [55] AR 49.

18 [56] AR 49-50.

19 [57] AR 50.

20 [58] *Id.*

21 [59] AR 51.

22 [60] AR 52.

23

DISPOSITIVE ORDER - 14

eight-hour day; could occasionally climb ladders, ropes and scaffolds; and occasionally crawl.[61]

The VE testified that the individual would be able to work as a cashier (DOT 211.462-010), a storage facility rental clerk (DOT 295.367-026), and a router (DOT 222.587-038).[62] When asked if it would affect the individual's ability to hold employment if they were absent from work two days a month, the VE said it would affect their ability to retain a job.[63] He stated that his testimony was consistent with the DOT.[64] He stated that the individual would need to avoid missing 2 to 3 partial days of work per month, with once a month as a baseline or to avoid missing 5 to 6 days over 12 months.[65] He stated that the individual would be allowed to be off task no more than 15 percent of the time.[66] When asked whether the individual could perform those jobs if they needed to avoid even moderate exposure to pulmonary irritants, he responded that they could perform them.[67] He

---

[61] *Id.*

[62] AR 53.

[63] *Id.*

[64] *Id.*

[65] AR 53-54.

[66] AR 54.

[67] *Id.*

testified that he obtained data from Occupational Employment Surveys and SkillTran Job Browser Pro.[68]

b.    _Written Testimony_

On April 15, 2020, Plaintiff completed an Adult Function Report.[69] He stated that he lived in an apartment with family.[70] When asked how his illness affected his ability to work, he said that when ill he had joint swelling, making it painful to walk; mouth and throat ulcerations, making it hard to speak; fevers; upset stomach; and severe eye pain.[71] He said he had very little routine, did not care for any other person or pets, and that his pain affected his ability to sleep at times.[72] He said that he can prepare sandwiches, salads and frozen meals but that when ill he has to choose foods that do not hurt his mouth sores and throat.[73] He said that he can clean, do laundry, mow once a week, and do dishes a few times a week but that when ill he is unmotivated to do things.[74] He said that when not ill he goes out

---

[68] AR 55.

[69] AR 229-238.

[70] AR 229.

[71] _Id._

[72] AR 230.

[73] AR 231.

[74] _Id._

daily but that when ill he almost never goes out; and that when he goes out he can go out alone by either car or a bicycle.[75] He said his hobbies are biking or playing video games and that when ill there are long stretches he cannot ride and is not able to get around much.[76]  He said that he goes to church, plays video games, and plays cards but that how often he can do that depends on his health.[77] He said that he is not sure how his social activities have changed because he has dealt with his illness since his early teens.[78] He said that his illness causes limitations in lifting, squatting, standing, bending, reaching, walking, kneeling, talking, stair climbing, seeing, and concentration.[79] He said that he has inflammation throughout his body that causes joint inflammation, inflammation in the lining of his eyes, and ulcerations in his mouth that are painful and make it hard to speak.[80] He said that he can follow instructions as well as the average person, gets along with authority figures, can handle stress moderately well, and can handle changes in routine.[81] He said that he wears glasses and that he takes Ilaris, which is an immune suppressor

---

[75] AR 232.

[76] AR 233.

[77] *Id.*

[78] AR 234

[79] *Id.*

[80] *Id.*

[81] AR 234-235.

that makes it harder to fight infections.[82] He said that he has an autoimmune

disease that is episodic so he can be healthy for two to three weeks and then have

inflammation that causes symptoms for one to three weeks.[83]

### 3.    The ALJ's Findings

The ALJ found Plaintiff's statements concerning the intensity, persistence,

and limiting effects of his "medically determinable impairments" inconsistent with

the objective medical evidence and other evidence of record.[84] The ALJ articulated

her reasoning as follows:

> The claimant has been diagnosed with TRAPS disorder. (Ex. 10F, Page 1; Ex. 11F, Page 5; Ex. 12F, Page 5). He reports experiencing periodic fever, mouth ulcers, and painful swallowing. (Ex. 6F, Page 4; Ex. 13F, Page 1). The claimant also reports experiencing muscular and abdominal pain. (Ex. 10F, Page 1; Ex. 13F, Page 1; Ex. 15F, Page 89). Although the claimant does not experience the common associated symptom of rashes, he does report acne during symptom flares. (Ex. 10F, Page 9; Ex. 14F, Page 1).
>
> However, the record reflects that the claimant only experiences symptoms during flares of his impairment. (Ex. 10F, Page 9). His TRAPS disorder and related flares are treated with Illaris injections. (Ex. 6F, Page 4). It is noted that the claimant's treatment keeps his impairment under good control despite mild breakthrough symptoms, and his symptoms of pain return only a few days before his next scheduled injection. (Ex. 10F, Page 6; Ex. 11F, Page 4; Ex. 15F, Page 73).[85]

---

[82] AR 235-236.

[83] AR 236.

[84] AR 23.

[85] *Id.*

The ALJ further reasoned:

> Despite the claimant's symptoms of pain, he has had consistently normal musculoskeletal examinations. The claimant continues to demonstrate normal strength. (Ex. 6F, Page 7; Ex. 12F, Page 5; Ex. 15F, Page 3). He also demonstrates normal range of motion. (Ex. 6F, Page 8; Ex. 10F, Page 3; Ex. 12F, Page 4). The claimant further demonstrates normal sensation. (Ex. 12F, Page 5). Based on the above, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. (SSR 16-3p). Of note, he also admits that he is able to prepare his own meals, do household chores, drive, and shop for himself in stores. (Ex. 4E).

> The claimant's TRAPS disorder and related symptoms of pain support the above limitation to light work except he can occasionally climb ladders, ropes, and scaffolds and crawl.[86]

### 4.    Relevant Medical Records

On April 2, 2018, Plaintiff was examined by William Drenguis, MD at the request of the Commissioner.[87]  Plaintiff's chief complaints were TRAPS and scoliosis.[88] Dr. Drenguis noted that Plaintiff was initially diagnosed with a different fever disorder, PFAPA (periodic fever aphthous stomatitis, pharyngitis and cervical adenitis), with symptoms beginning at age 4.[89]  During puberty, Plaintiff's condition worsened and he was diagnosed with TRAPS, which was marked with high fevers, abdominal pain, severe headaches, eye pain, myalgias,

---

[86] *Id.*

[87] AR 585-590.

[88] AR 585.

[89] *Id.*

and swelling of the joints.[90] After failure of multiple medications, Plaintiff's symptoms were controlled to a degree with Ilaris, and since taking the medication he has symptoms one week per month with decreased myalgias and arthralgias but continues to experience fevers, headaches, eye pain and ulcers in his mouth and throat.[91]  As to activities of daily living, he reported that during a flare-up he would spend the majority of his time in bed but that when not having a flare-up he was able to perform personal care activities without assistance and could lift up to 50 pounds comfortably.[92]

Dr. Drenguis noted that Plaintiff was status-post multiple surgeries for cleft lip and palate in 2009 and 2010.[93] On examination, Plaintiff had a Marfan's appearance and was able to walk, sit, and get on and off the exam table with no difficulty.[94] Plaintiff's examination results were benign with the exception of mild thoracolumbar scoliosis with minimal tenderness to palpation of the thoracic and lumbar spine.[95]  Dr. Drenguis diagnosed TRAPS syndrome characterized by flare-

---

[90] *Id.*

[91] *Id.*

[92] AR 585-586.

[93]  AR 586.

[94] *Id.*

[95] AR 588-589.

1  ups for one week per month with 102 degree fevers, fatigue, headache, eye pain

2  and abdominal pain, but not myalgias and arthralgias.[96]

3       Dr. Drenguis noted that during times when he is not in a flare-up Plaintiff

4  has few complaints.[97] He noted that his functional assessment was based on

5  Plaintiff's ability on a day that he was not in a flare-up.[98] He opined that on a day

6  when not in a flare-up he is able to sit, stand, and walk for six hours in a day; does

7  not need an assistive device; can lift 50 pounds occasionally and 25 pounds

8  frequently; can occasionally climb steps, stairs, ladders, ropes and scaffolds; can

9  frequently balance, stop, kneel, crouch and crawl, and is limited by the residual

10  myalgias of TRAPS.[99]  He opined that Plaintiff was able to frequently reach

11  overhead, reach forward, handle, finger and feel.[100] He opined that Plaintiff would

12  have no limitation to working at heights, around heavy machinery, at extreme

13  temperatures, or around dust, fumes, gases or excessive noise.[101]

14

15

16  _____

17  [96] AR 589-590.

18  [97] AR 590.

19  [98] *Id.*

20  [99] *Id.*

21  [100] *Id.*

22  [101] *Id.*

23

On April 19, 2018, Plaintiff was examined by Troy Bruner, Ed.D., at the request of the Commissioner.[102] Plaintiff presented with no complaints of psychological nature but advised that he had past treatment and a prior diagnosis of adjustment disorder.[103] Plaintiff had attended school to the 10th grade and was studying in an online course for his GED.[104] Plaintiff did not report any difficulties with activities of living but reported that he has throat pain, headaches, joint pain, and ulcers in his mouth for up to a week every month due to his physical condition.[105]  On examination, his concentration was adequate, his behavior was cooperative and polite, his speech was normal with no confusion or tangentiality, his thought content was normal, his mood and affect was normal, he was oriented, he displayed average intelligence, his concentration was adequate, and he was able to adequately answer questions regarding abstract thinking, similarities, and judgement/insight.[106] He opined that Plaintiff had no psychiatric diagnosis and that he would have no difficulty in managing funds, performing simple or complex tasks, accepting instruction from supervisors, interacting with coworkers and the

---

[102] AR 591-594.

[103] AR 591.

[104] AR 592.

[105] *Id*.

[106] AR 592-593.

public, performing work activities without special instructions, maintaining

attendance, and managing workplace stress.[107]

Between January 18, 2019, and March 13, 2020, Plaintiff presented to

Yakima Pediatric Associates at a frequency of approximately every three to four

weeks for a total of 21 visits.[108]  On March 21, 2019, Plaintiff was seen by Matthew

Basiaga, DO, who noted that Plaintiff had a flare in January because his

medication was being shipped and was not arriving on time.[109] Plaintiff reported

being asymptomatic if he took his medication every 3 weeks instead of every 4

weeks.[110] On examination, Plaintiff's fever was 100.2.[111]  Plaintiff reported only one

flare since his last appointment.[112] His last appointment had taken place on March

1, 2019.[113] Dr. Basiaga noted that Plaintiff had been initiated on Ilaris in December

2014 at a dosage of 200 mg taken every 4 weeks but that due to an incomplete

response his dose was increased to 300 mg in October 2015.[114] His dosage had

---

[107] AR 593-594.

[108] AR 596.

[109] AR 645.

[110] *Id*.

[111] *Id*.

[112] AR 646.

[113] AR 596.

[114]  AR 645.

increased again in November 2018, when his dosage was increased again to 300 mg taken every 3 weeks.[115]

On January 17, 2020, Plaintiff presented to Yakima Pediatrics for a physical and advised that he was getting flare-ups of his illness because his medication Ilaris sometimes arrived late.[116] In was noted that Plaintiff was doing well on medication unless he had a lapse due to pharmacy's delivery of medication.[117]  He was aging out for the pediatrics program and was to be referred to an adult rheumatologist.[118]  On February 5, 2020, Plaintiff was referred to rheumatology.[119]

On July 16, 2020, Plaintiff was examined by Susan Canny, MD, who noted that Plaintiff was well-controlled on medication but had flare-ups recently due to medication delays.[120]  On August 13, 2020, Plaintiff presented to ARNP Tinal Flores of Yakima Valley Memorial complaining of right ear pain, as well as recent

---

[115] Id.

[116] AR 721.

[117] AR 734.

[118] *Id.*

[119] AR 737.

[120] AR 642-643.

autoimmune flare-up.[121]  On examination, his right ear was erythematous and bulging and an ear tube was visualized and removed.[122]

On August 30, 2020, Mark Egbert DDS examined Plaintiff for evaluation of orthognathic surgery.[123] He noted that Plaintiff had a history of bilateral cleft lip with unilateral cleft alveolar and palate and was status post-surgical repair of oronasal communication.[124]

Plaintiff presented to Seattle Children's Hospital on October 13, 2020, with a fever of 100.3.[125] Musculoskeletal pain, migraine headaches, and lethargy was noted on examination.[126] Dr. Stephen Wong noted that Plaintiff's medication had been increased to 400 mg taken every 3 weeks and that his TRAPS appeared to be under good control but that he had mild breakthrough symptoms a few days prior to each injection.[127] On examination, he had diffuse skin nodules, scar,s and cystic lesions on his face and neck.[128]

---

[121] AR 680.

[122] *Id.*

[123] AR 640.

[124] *Id.*

[125] AR 635.

[126] AR 634.

[127] AR 639.

[128] AR 636.

On October 15, 2020, Plaintiff was seen by Anshul Pandhi, MD, in Bellevue Medical Center's rheumatology clinic.[129] He noted that Plaintiff suffered from TRAPS and had been diagnosed with a periodic fever syndrome (PFAPA) but his diagnosis had been changed to TRAPS about two years prior.[130]  She noted a diagnosis of TRAPS and high risk medication use.[131]

On December 15, 2020, Plaintiff was admitted to Yakima Valley Memorial after presenting to the emergency room with right lower quadrant pain worsening over the past seven days and being assessed with acute appendicitis.[132] He tolerated surgery but had a perforated appendix with abscess.[133] Laboratory tests indicated a low red blood cell count, hemoglobin, and hematocrit.[134]

On December 17, 2020, Plaintiff spoke with Brianna Simms of Bellevue Medical Center's rheumatology clinic to ask if he could resume taking his medication following an appendectomy.[135] She noted that Plaintiff had an appendectomy on December 15, 2020, and should have taken his dose of Ilaris on

---

[129] AR 654.

[130] *Id*.

[131] *Id*.

[132] AR 667, 672.

[133] AR 668.

[134] AR 682-683.

[135] AR 653.

December 16, 2020, but had been told by the surgeon to hold off on taking it and was placed on a six day course of antibiotics.[136]

On December 18, 2020, Plaintiff presented to ARNP Karen Ely at Yakima Valley Memorial Hospital reporting that he had a fever since the day prior which was worsening and had reached 102.[137] Plaintiff reported that he had been admitted to the hospital on December 15, 2020, with appendicitis and that following his appendectomy his rheumatologist had advised him to take his scheduled dose of Ilaris.[138] On examination, there was diffuse abdominal pain status post-appendectomy and Plaintiff was tachycardic and febrile.[139] Due to history of TRAPS and fever with missed doses of Ilaris, a CT scan was ordered to rule out an abscess.[140] A CT scan indicated right lower quadrant inflammatory stranding and some colonic wall thickening but no drainable fluid collections.[141]

On March 29, 2021, Plaintiff was seen by Dr. Pandhi.[142] She noted that Plaintiff was reporting mild breakthrough symptoms for 3-4 days prior to his

---

[136] AR 654.

[137] AR 665.

[138] *Id.*

[139] AR 666.

[140] *Id.*

[141] AR 697.

[142] AR 651.

medication dosing when his medication, (Ilaris) canakinumab, was being dosed at 400 mg taken every 3 weeks.[143]  She noted that his ESR and CRP were elevated and assessed him with TRAPS and high-risk medication use.[144]

On May 10, 2021, Dr. Pandhi wrote that Plaintiff was disabled from work and subsequently released him to return to work on May 24, 2021.[145] On June 3, 2021, RN Margaret Christiansen noted that Plaintiff was on a waiting list to establish care with a new PCP and that in the meantime, Mountain View Home Health would go to Plaintiff's home to administer Plaintiff's Ilaris injections.[146]

On November 12, 2021, Plaintiff was examined by Marquetta Washington, ARNP, at the request of the Commissioner.[147]  She noted that the history of his present illness was onset in 2010, with progressive symptoms of swelling and intermittent pain all joints, mouth and throat ulcerations, and pain when moving eyes.[148]  She noted that stress triggers symptoms and that Ilaris injections are taken every three weeks and provide relief for one to one-and-a-half weeks.[149]

---

[143] *Id.*

[144] AR 652.

[145] AR 839, 840.

[146] AR 761-762.

[147] AR 657-664.

[148] AR 657.

[149] *Id.*

Plaintiff was also positive for a history of scoliosis, bilateral cleft lip, an appendectomy in December 2020, and five surgeries to repair cleft palate.[150] Plaintiff reported independence with activities of daily living, and said that he could take care of daily needs, shopped every two weeks and was able to drive a car.[151] On examination, Plaintiff was alert and oriented, had no difficulty walking, bending, or getting on and off exam table, had no skin abnormalities other than acne scarring, and had a small ulcer to his inner upper lip as well as a cleft lip.[152] Gait and station were normal, motor strength was within normal limits, straight leg raising was negative bilaterally, Waddel's sign was negative, cranial nerves were intact and sensory, and deep tendon reflexes were within normal limits.[153] He had no muscle tenderness or trigger points.[154]  She diagnosed TRAPS and low vision.[155] ARNP Washington opined that Plaintiff can lift and carry 50 pounds occasionally and 25 pounds frequently; can push and pull with no limitation; has no limitation in sitting, standing or walking; has no limitation to climbing, stooping, bending, balancing, crawling, kneeling or crouching; and no limitation in

---

[150] AR 658.

[151] *Id.*

[152] AR 659.

[153] AR 661.

[154] *Id.*

[155] *Id.*

1  handling, fingering, gripping and feeling; had no limitation in overhead or forward

2  reaching bilaterally; has no limitation in hearing and speech but wears glasses for

3  low vision; has no limitation to working at heights, working around heavy

4  machinery, working at extreme temperatures, working around gas and fumes,

5  working around vibration, and working around noise.[156]

6       On February 7, 2022, Plaintiff presented to Dr. Pandhi, who noted that

7  Plaintiff reported that he was doing well with good control of musculoskeletal pain

8  with Ilaris and was tolerating the medication well.[157] He noted that laboratory

9  testing on April 12, 2021, indicated normal CBC, ALT, and serum creatinine.[158]

10      On November 3, 2022, it was noted by Syed Islam, MD, that Plaintiff should

11  be tapered off prednisone regardless of whether he was taking Ilaris.[159]  On

12  November 29, 2022, it was noted that Plaintiff's medication was being shipped with

13  a target date of December 2, 2022.[160] On December 13, 2022, the pharmacy made

14  an urgent request to Dr Pandhi for clinic notes because Plaintiff's insurance was

15  refusing to reimburse the pharmacy for his Ilaris.[161]

16

   _____

17

18  [156] AR 661-663.

19  [157] AR 799.

    [158] *Id.*

20  [159] AR 814-815.

21  [160] AR 818.

22  [161] AR 821.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

5.    Analysis

The medical record reflects that Plaintiff has suffered from lifelong impairments that included multiple surgeries to repair cleft lip and palate at a young age, scoliosis, and childhood onset of a fever disorder currently diagnosed as TRAPS. Moreover, the record reflects that while the two former conditions have not been symptomatic for some time, the latter condition has caused severe although cyclical and intermittent symptoms.  The record before the Court is supportive of Plaintiff's testimony that he suffers from flares of his condition and that those flares happened regularly during the relevant period.

Notably, the ALJ acknowledged in her decision that Plaintiff suffers from flares of his condition.  She stated in her reasoning that he "only experiences symptoms during flares of his impairment."[162] She went on to note further that Plaintiff's condition is under good control with the drug Ilaris and that he experiences only mild breakthrough symptoms for a few days before his scheduled injection.[163]  The ALJ's analysis of Plaintiff's symptoms was inherently flawed. She focused on Plaintiff's normal musculoskeletal examinations as a support of her reasoning that his symptoms during flare-ups were not severe.[164] This reasoning

---

[162] AR 23.

[163] *Id.*

[164] *Id.*

fails to consider that the condition is one characterized by fever, abdominal pain, ulcers of the throat and mouth, and painful swelling of the eyes.[165] Dr. Drenguis opined that Plaintiff's TRAPS syndrome was characterized by flare-ups for one week per month with 102 degree fevers, fatigue, headache, eye pain and abdominal pain, but not myalgias and arthralgias.[166] It was Plaintiff's testimony both at hearing and in his Adult Function Report that when he suffered from flare-ups and breakthrough symptoms he suffered fevers, swollen tonsils and lymph nodes, headaches, inflammation in the lining of his eyes, and ulcers in his mouth and throat that made it difficult to eat and to speak.[167]

In addition to focusing on irrelevant musculoskeletal examinations, the ALJ failed to consider the medical record in the context that Plaintiff's medication was required to be increased several times over the course of the relevant period until he ultimately reached the maximum dosage allowed.[168] It was only after reaching that maximum dosage that Plaintiff's symptoms were mild enough for him to return to fulltime employment.[169] While the ALJ considered some objective

---

[165] National Institutes of Health, TNF Receptor-Associated Periodic Fever Syndrome, www.ncbi.nlm.nih.gov (last viewed May 16, 2024)

[166] AR 589-590.

[167] AR 43, 234.

[168] AR 44, 639, 645, 651.

[169] AR 44.

findings, she has taken them out of context. She has failed to consider that Plaintiff's medical records reflect that he suffered from fevers, from mouth and throat ulcerations, and from swelling in and around his eyes.[170]

The ALJ failed to address Plaintiff's testimony regarding his symptoms during the periods he had flares.  This error is particularly harmful with regard to Plaintiff's testimony regarding his absenteeism. In her RFC, the ALJ fails to include any provision for time off work or for failure to maintain attendance. Moreover, the ALJ did not cite to any evidence that is inconsistent with Plaintiff's testimony.   The ALJ also ignored relevant evidence and testimony that Plaintiff had been forced to drop out of college during the relevant period due to extended absences caused by his condition. The ALJ erred in failing to consider that Plaintiff's condition was a cyclic one which would be characterized by severe symptoms at times, as well as mild or moderate symptoms at other times.[171]

In considering Plaintiff's daily activities, the ALJ again failed to consider Plaintiff's daily activities in the context of the cyclic nature of his symptoms. Plaintiff's daily activities bear on his credibility if the level of activity is inconsistent with his claimed limitations.[172] An ALJ may rely on a plaintiff's daily activities to support an adverse credibility determination only when those activities

---

[170] AR 634, 635, 659, 665.

[171] *Trevizio v Berryhill*, 871 F. 3d. 664, 679 (9th Cir. 2017).

[172] *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)

either "contradict [the plaintiff's] other testimony," or "meet the threshold for transferable work skills"; *i.e.*, where she "is able to spend a substantial part of ... her day performing household chores or other activities that are transferable to a work setting."[173] Here, neither instance applies.  Plaintiff's daily activities are consistent with his testimony that when he is not ill, he is able to engage in a wide range of activities but that when he experiences flares in his condition he is limited.  In both his written and oral testimony, Plaintiff differentiated between activities he was able to engage in when he was having a flare and when he was generally well.[174] Dr. Drenguis opined that Plaintiff's residual functional capacity differs during a period that he has a flare and a period when he is healthy.[175]

Additionally, the Court notes that the Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from his credibility as to his overall disability."[176]

---

[173] *Smolen v. Chater*, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996).

[174] AR 42, 231.

[175] AR 590.

[176] *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

6.    Summary

Because the ALJ did not give good reasons for discounting Plaintiff's symptom reports, a remand is warranted.  On remand, the ALJ is directed to consider the consistency of Plaintiff's symptoms reports with the record as a whole, with consideration of the relative degree of functional decline during episodes of flares.

**B.    Step Three: Plaintiff failed to establish consequential error.**

Plaintiff argues that the ALJ did not properly consider whether he met or equaled Listing 14.07.  The Commissioner asserts that Plaintiff failed to cite to any evidence which establishes that he meets the listing criteria for Listing 14.07(c).

1.    Standard

If a claimant meets all of the listing criteria or if his impairments medically equal a listed impairment, he is considered disabled.[177] Medical equivalence will be found if the medical findings are at least of equal medical significance to the required criteria.[178] "[I]n determining whether a claimant equals a listing under step three . . . the ALJ must explain adequately his evaluation of alternative tests

---

[177] *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (requiring a claimant to show that the impairment meets (or medically equals) all of the specified medical criteria, not just some of the criteria).

[178]  20 C.F.R. § 416.926; *Marcia v. Sullivan*, 900 F.2d 172, 175 (9th Cir. 1990).

1 and the combined effects of the impairments."[179]  Pursuant to the applicable

2 regulations, an ALJ may find that a plaintiff meets a listing without a medical

3 opinion supporting that finding, but cannot make a determination that a plaintiff

4 equals a listing unless that finding is supported by a medical opinion of record from

5 an acceptable medical source that the plaintiff's impairment medically equals the

6 listing.[180]

---

[179] *Marcia*, 900 F.2d at 176; *see also Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (The ALJ "must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.").

[180] Soc. Sec. Ruling 17-2p. *See also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (requiring a claimant to show that the impairment meets (or medically equals) all of the specified medical criteria, not just some of the criteria).

1

2.   The ALJ's Findings

2

The ALJ found that Plaintiff did not meet or equal a listing.  She articulated

3

her reasoning as follows:

4

> The severity of the claimant's physical impairments does not meet or
> medically equal the criteria of 14.07. The claimant has not been
> diagnosed with any of the specific impairments listed in 14.07(A). The
> claimant has not undergone stem cell transplantation as required by
> 14.07(B). Further, the claimant does not have a marked limitation in
> activities of daily living, maintaining social function, or completing
> tasks in a timely manner as required by 14.07(C). The claimant admits
> that he has no difficulty performing tasks of personal care, spends time
> with others, and finishes what he starts. (Ex. 4E). Therefore, the
> claimant's physical impairments do not meet or medically equal the
> criteria of Listing 14.07.[181]

3.   Analysis

Plaintiff does not meet the criteria to meet or equal a listing pursuant to

14.07(A) or 14.07(B), and the ALJ properly considered whether he had a marked

limitation in performing activities of daily living, interacting with others, or

maintaining attention and concentration which was required to meet or equal

Listing 14.07(C).  Because Plaintiff admitted that when he did not have a flare-up

of his condition, he did not have difficulty with performing those tasks, the ALJ did

not err in determining that Plaintiff did not meet the criteria.  While it is possible

that Plaintiff might equal the criteria, the ALJ could not make such a

determination without a medical opinion supporting that fact and Plaintiff offers

no such opinion.

4.   Summary

1    Plaintiff did not meet his burden to show that he met a listing and no medical

2    opinion of record supports a determination that he equaled a listing.

3    **C.    Medical Opinions: This issue is moot.**

4    Plaintiff argues the ALJ failed to properly assess the medical opinion as to

5    both supportability and consistency.  As discussed above, the ALJ failed to consider

6    the medical record in its proper context with regard to Plaintiff's function when not

7    experiencing a flare-up or breakthrough symptoms and his function when

8    experiencing a flare.  Notably, Dr. Drenguis' opinion contained clear language that

9    the functional limitations provided were valid only during periods that Plaintiff

10   was not experiencing a flare in his condition and that when he was experiencing a

11   flare, Plaintiff's function was more limited.[182] The ALJ did not acknowledge that

12   statement when articulating her consideration of Dr. Drenguis' opinions.[183]

13   Because the ALJ did not articulate any consideration of the differences in

14   Plaintiff's function during flares, it is unclear to the Court whether she considered

15   that issue. On remand, the ALJ will need to reevaluate the medical opinions as a

16   whole, however, and this issue is therefore moot.

---

[181] AR 22.

[182] AR 590.

[183] AR 24.

1

**D.    Remand for Further Proceedings**

2        Plaintiff submits a remand for payment of benefits is warranted. The

3    decision whether to remand a case for additional evidence, or simply to award

4    benefits, is within the discretion of the court."[184] When the court reverses an ALJ's

5    decision for error, the court "ordinarily must remand to the agency for further

6    proceedings."[185]

7        The Court finds that further development is necessary for a proper disability

8    determination. Here, it is not clear what, if any, additional limitations are to be

9    added to the RFC. Therefore, the ALJ should consider whether testimony should be

10    received from a medical expert pertaining to Plaintiff's physical impairments, and

11    then consider any additional evidence presented, and make findings at each of the

12    five steps of the sequential evaluation process.

13                    **IV.    Conclusion**

14        Accordingly, **IT IS HEREBY ORDERED**:

15

16

17    _____

[184] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*,

18    761 F.2d 530 (9th Cir. 1985)).

19    [185] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke*  379 F.3d at  595

20    ("[T]he proper course, except in rare circumstances, is to remand to the agency for

21    additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*,

22    775 F.3d 1090, 1099 (9th Cir. 2014).

23

1.      The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.      The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 6 and 10**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 21st  day of May, 2024.

_____
EDWARD F. SHEA
Senior United States District Judge